EILEEN A. GALLAGHER, A.J.:
{¶ 1} This case involves the interpretation of various insurance policies. In this consolidated appeal, defendants-appellants Erie Insurance Co. ("Erie") and William Hobbs ("Hobbs") and third-party defendants-appellants Amica Mutual Insurance Co. ("Amica"), Recreation Insurance Specialists, L.L.C. ("Recreation") and RIS Risk Management Services, L.L.C. ("Risk") appeal from the trial court's order granting third-party defendant-appellee Westfield Insurance Co.'s ("Westfield's") motion for summary judgment and denying Erie's motion for summary judgment regarding insurance coverage for injuries sustained by Eric Raudins ("Raudins") arising out of a January 13, 2011 automobile accident.[1] Appellants contend that the *1044 trial court erred in concluding that Westfield was not obligated to provide liability insurance coverage to Hobbs, the driver of the accident vehicle, under a non-owned auto liability endorsement to a businessowners policy Westfield issued to Recreation and Risk. Erie, Recreation and Risk further contend that the trial court erred in concluding that the accident was covered under a personal auto liability insurance policy Erie issued to Hobbs. For the reasons that follow, we affirm the decision of the trial court.
Factual and Procedural Background
The Accident and the Companies
{¶ 2} On January 13, 2011, Hobbs and Raudins were traveling from Risk and Recreation's offices in Akron, Ohio to the Hilton Garden Inn in Mayfield Heights, Ohio where Hobbs was scheduled to make a presentation on trailer insurance to an insurance agency. Raudins accompanied Hobbs to the January 13, 2011 meeting out of "curiosity" and "to get out of the office." Hobbs was driving his 2003 Toyota Tundra truck (the "accident vehicle" or the "Toyota Tundra") and Raudins was the front seat passenger. On their way to the meeting, Hobbs hit a patch of ice on I-271 North, lost control of the vehicle and the vehicle struck a concrete barrier. Raudins injured his neck in the accident, requiring surgery.
{¶ 3} At the time of the accident, Hobbs and Raudins were involved in three related business entities - Recreation, Risk and RIS Holdings, L.L.C. ("RIS Holdings").
{¶ 4} Recreation was an insurance agency in the business of underwriting insurance policies for recreational vehicles. At the time of the accident, Hobbs was the president of Recreation, Raudins was the company's vice-president and chief operating officer and the two men comprised its board of directors.
{¶ 5} Risk was in the business of administering claims made under insurance policies for recreational vehicles. At the time of the accident, Hobbs was the president of Risk and Hobbs and Raudins comprised its board of directors.
{¶ 6} RIS Holdings, a holding company, was the sole member of Recreation and Risk. At the time of the accident, Hobbs and Raudins were two of the members of RIS Holdings. Hobbs was the president of RIS Holdings and Raudins was its vice-president and chief operating officer. Raudins testified that he and Hobbs were responsible for "overseeing [the] strategy and direction" of the three entities and "mak[ing] sure that those companies operated and functioned properly." Raudins testified that he did not have "any defined duties" for the companies and that what he did "varied widely." Although Recreation and Risk each had employees who earned wages reported on W-2 forms, Hobbs and Raudins were not among them. Hobbs and Raudins were compensated for the services they provided through guaranteed payments from Recreation, which were reported on K-1 forms issued by RIS Holdings.
{¶ 7} Raudins filed workers' compensation claims for the injuries he sustained in the accident but his claims were denied on the ground that he was not an employee of any of the companies and did not otherwise have workers' compensation coverage.[2]
*1045 The Insurance Policies
{¶ 8} At the time of the accident, Erie insured Hobbs under a "family auto insurance policy" (the "Erie policy"). The Toyota Tundra was specifically identified as a "covered auto" on the declarations page of the policy. The Erie policy included bodily injury auto liability coverage with limits of $250,000 per person and $500,000 per accident and uninsured/underinsured motorists ("UM/UIM") coverage with limits of $250,000 per person and $500,000 per accident.
{¶ 9} Amica issued a personal automobile policy to the Raudinses (the "Amica policy"). As it relates to this case, the Amica policy provided UM/UIM coverage with limits of $1,000,000 per person and $1,000,000 per accident.
{¶ 10} Westfield issued a "businessowners package policy" to Recreation and Risk (the "Westfield policy").[3] The policy included an endorsement for "hired auto and non-owned auto" liability coverage with a $2,000,000 limit (the "endorsement").
The Litigation
{¶ 11} On August 20, 2012, the Raudinses filed a complaint in the Cuyahoga County Court of Common Pleas (Case No. CV-12-789591) against Hobbs, Erie and Amica to recover for injuries and damages sustained as a result of the accident (the "first lawsuit"). Raudins asserted a negligence claim against Hobbs and claims for breach of contract and declaratory judgment against Erie and Amica, seeking to establish his rights against the insurers under their respective insurance policies. Dee Raudins asserted a claim for loss of consortium against Hobbs, Erie and Amica. Erie filed an answer[4] and counterclaim for declaratory judgment, seeking a declaration that the Erie policy afforded no liability or UM/UIM coverage for Raudins' injuries and damages. Amica filed an answer, a counterclaim for declaratory judgment and a cross-claim against Hobbs for contribution and/or indemnification. Amica sought a declaration that it owed no UM/UIM coverage to Raudins as a result of the *1046 accident or, alternatively, that (1) it owed no UM/UIM coverage until all other liability coverage and primary UM/UIM coverage was exhausted or (2) any UM/UIM coverage under the Amica policy applied on a pro rata basis with other applicable UM/UIM coverage. Hobbs filed an answer and a cross-claim against Erie for declaratory judgment, seeking a declaration that he was entitled to liability coverage under the Erie policy. The Raudinses filed an answer to Erie's counterclaim. Hobbs and Erie filed answers to the cross-claims asserted against them.
{¶ 12} In March 2013, Hobbs filed a third-party complaint against Recreation, Risk, Westfield and Community Insurance Company d.b.a. Anthem Blue Cross and Blue Shield ("Anthem"). Hobbs asserted a claim for contractual indemnity against Recreation and Risk, alleging that the companies had a duty to indemnify him for Raudins' alleged damages pursuant to indemnification provisions in their operating agreements. Hobbs asserted a claim for breach of contract against Westfield for its failure to defend and indemnify him under the Westfield policy and asserted a claim for declaratory judgment against Anthem, seeking a declaration that Anthem was not entitled to recover medical benefits it paid to Raudins from Hobbs. Westfield and Anthem filed answers to Hobbs' third-party complaint.
{¶ 13} On January 10, 2014, the Raudinses filed a second lawsuit in the Cuyahoga County Court of Common Pleas against Westfield (the "second lawsuit"). Raudins asserted a claim for UM/UIM coverage under the Westfield policy, and Dee Raudins asserted a claim for loss of consortium. In February 2014, the trial court consolidated the two lawsuits. In March 2014, Hobbs voluntarily dismissed his cross-claim against Erie and his third-party complaint against Recreation and Risk in the first lawsuit without prejudice.
Motions for Summary Judgment
{¶ 14} In August 2014, Westfield, Erie and Amica all filed motions for summary judgment on the issue of insurance coverage. Each insurer argued that there was no liability coverage and/or UM/UIM coverage for the accident under its insurance policy and that the other insurers were responsible for coverage for the accident.
{¶ 15} Westfield argued that it was entitled to summary judgment on Hobbs' third-party complaint in the first lawsuit because Hobbs did not meet the definition of an "insured" under the endorsement[5] and that it was entitled to summary judgment on the Raudinses' complaint in the second lawsuit because the Westfield policy did not include UM/UIM coverage. Erie argued that it owed no liability coverage or UM/UIM coverage for the accident under its policy because (1) the policy excluded coverage for injuries to an insured's employees occurring in the course of employment and (2) Hobbs was not "legally" required to "pay" for Raudins' injuries and Raudins was not "legally entitled to recover" for his injuries from Hobbs (as necessary to trigger liability coverage or UM/UIM coverage under the policy) based on "fellow employee immunity" under R.C. 4123.741. Erie further argued that the Westfield policy had primary coverage because it insured the accident vehicle as a "non-owned auto." Amica argued that both the Erie policy and the Westfield policy provided liability coverage for the accident vehicle and that, given the amount of liability *1047 coverage available under those policies, the accident vehicle was not uninsured or underinsured so as to trigger UM/UIM coverage under the Amica policy. In the alternative, Amica argued that any UM/UIM coverage under the Amica policy was secondary and excess to the UM/UIM coverage under the Erie policy.
{¶ 16} The Raudinses also filed a motion for partial summary judgment on the issue of insurance coverage, requesting a finding that liability coverage existed under both the Erie and Westfield policies and that the Amica policy provided UM/UIM coverage to Raudins to the extent the liability limits under the Erie and Westfield policies were insufficient to cover his damages. The Raudinses argued that even if Hobbs was not an "insured" under the non-owned auto liability endorsement, liability coverage nevertheless existed under the Westfield policy because the named insureds, Recreation and RIS, were "derivatively liable for the injuries [Hobbs] negligently caused in furthering their business" under the doctrine of respondeat superior. Each party opposed the motions for summary judgment filed by the other parties.[6]
{¶ 17} On January 29, 2016, the trial court ruled on the parties' summary judgment motions. Concluding that Hobbs was entitled to liability coverage under the Erie policy but was not an insured for purposes of the non-owned auto liability endorsement under the Westfield policy,[7] the trial court: (1) granted the Raudinses' motion for summary judgment as to Amica and Erie and denied it as to Westfield; (2) granted Westfield's motion for summary judgment with respect to coverage under its businessowners policy; (3) denied Erie's motion for summary judgment and (4) granted Amica's motion for summary judgment to the extent it requested a declaration that Erie was obligated to provide liability coverage for Hobbs but otherwise denied the motion. The trial court specifically found as follows:
On the record evidence I find no genuine issue of material fact on the lawsuits' claims for declaration of the rights and obligations of the parties under the various insurance contracts. Accordingly, summary declaratory judgment is entered as follows:
1) Erie Insurance Company is required under the terms of insurance policy number Q05-7405925 to indemnify William Hobbs for compensatory damages proximately caused by Hobbs's negligence to Eric Raudins in the January 13, 2011, accident, up to the policy's $250,000 per person limit;
2) Erie is obligated to defend Hobbs against the negligence claim asserted in case number 789591 by Raudins and his wife;
3) Amica Mutual Insurance Company is obligated under the terms of insurance policy number 910834-1098 *1048 to provide underinsured motorists coverage to Raudins for his damages in excess of $250,000 incurred because of Hobbs's negligence, to limit of $750,000; and
4) Westfield Insurance Company is not obligated under the terms of insurance policy number BOP 3760387 to provide liability coverage to Hobbs or uninsured/underinsured motorists coverage to Raudins for any claims arising out of the January 13, 2011, accident.
{¶ 18} On January 20, 2017, the Raudinses, Hobbs, Erie and Amica voluntarily dismissed all claims between and among them with prejudice, pursuant to Civ.R. 41(A). In the notice of partial dismissal, Erie and Amica reserved their right to appeal the trial court's decision on summary judgment as to Westfield. On August 10, 2017, Hobbs dismissed his third-party complaint against Anthem with prejudice.
{¶ 19} Appellants appealed. In Appeal Nos. 106232 and 106233, Amica and Hobbs raised the following assignment of error for review:
The trial court erred in determining that Westfield's insurance policy issued to Recreation and Risk did not provide coverage for the William Hobbs automobile accident and Eric Raudins' subsequent injuries.
{¶ 20} In Appeal Nos. 106236 and 106238, Erie, Recreation and Risk raised the following three assignments of error for review:
Assignment of Error No. 1: The Trial Court erred when it failed to find that Appellee, Westfield Insurance Company, is primarily obligated under the terms of its Insurance Policy to provide primary coverage for the claims out of the January 13, 2011 Accident, because the policy provided primary coverage for "insured contracts" such as the Indemnity provisions found in the Company's Operating Agreement.
Assignment of Error No. 2: The Trial Court erred when it failed to find that the policy exclusion contained in Erie Insurance Company's Policy was applicable to the January 13, 2011 Accident, thereby eliminating coverage under the Erie Policy.
Assignment of Error No. 3: Alternatively, the Trial Court erred when it failed to hold that a finding of coverage under Erie Insurance Company's policy should have resulted in a Pro-Rata Apportionment of liability between Erie Insurance Company and Westfield Insurance Company.
{¶ 21} Appellants' assignments of error overlap. Accordingly, we address them together where appropriate.
Law and Analysis
Standard of Review
{¶ 22} We review summary judgment rulings de novo, applying the same standard as the trial court. Grafton v. Ohio Edison Co. , 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and conduct an independent review of the record to determine whether summary judgment is appropriate.
{¶ 23} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.
{¶ 24} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment.
*1049 Dresher v. Burt , 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party has the reciprocal burden to point to evidence of specific facts in the record demonstrating the existence of a genuine issue of material fact for trial. Id. at 293, 662 N.E.2d 264. Summary judgment is appropriate if the nonmoving party fails to meet this burden. Id.
Principles Governing Interpretation of Insurance Policies
{¶ 25} The interpretation of an insurance policy is an issue of law that we review de novo. See, e.g., Laboy v. Grange Indemn. Ins. Co. , 144 Ohio St.3d 234, 2015-Ohio-3308, 41 N.E.3d 1224, ¶ 8 ; Sarrough v. Budzar , 2015-Ohio-3674, 38 N.E.3d 921, ¶ 19 (8th Dist.) ; see also Sharonville v. Am. Emps. Ins. Co., 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 6 ("An insurance policy is a contract whose interpretation is a matter of law."). Insurance policies are interpreted by applying the same rules and principles used to interpret other contracts. Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd. , 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992). The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy. Laboy at ¶ 8. We "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." Westfield Ins. Co. v. Galatis , 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. To that end, the words and phrases used in an insurance policy are given their plain and ordinary meaning, "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents" of the policy. Alexander v. Buckeye Pipe Line Co. , 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus; see also Laboy at ¶ 8 ; Smith v. Erie Ins. Co. , 148 Ohio St.3d 192, 2016-Ohio-7742, 69 N.E.3d 711, ¶ 18 (When interpreting policy language, "we keep in mind that '[a]n insurance policy is a contract; in interpreting contracts, courts must give effect to the intent of the parties, and that intent is presumed to be reflected in the plain and ordinary meaning of the contract language.' "), quoting Granger v. Auto-Owners Ins. , 144 Ohio St. 3d 57, 2015-Ohio-3279, 40 N.E.3d 1110, ¶ 20. We give meaning to every word used and "cannot overlook the fact that certain words exist." Am. Chem. Soc. v. Leadscope, Inc. , 10th Dist. Franklin No. 04AP-305, 2005-Ohio-2557, 2005 WL 1220746, ¶ 34, citing Cleveland Elec. Illum. Co. v. Cleveland , 37 Ohio St.3d 50, 524 N.E.2d 441 (1988).
{¶ 26} "Where the provisions of an insurance policy are clear and unambiguous, courts may not indulge themselves in enlarging the contract by implication in order to embrace an object distinct from that contemplated by the parties." Crum & Forster Indem. Co. v. Ameritemps, Inc. , 8th Dist. Cuyahoga No. 99610, 2013-Ohio-5419, 2013 WL 6571817, ¶ 11, citing Gomolka v. State Auto. Mut. Ins. Co. , 70 Ohio St.2d 166, 168, 436 N.E.2d 1347 (1982). The court looks only to the plain language of the policy in determining the rights and obligations of the parties. Acuity, A Mut. Ins. Co. v. Siding & Insulation Co. , 2016-Ohio-1381, 62 N.E.3d 937, ¶ 9 (8th Dist.). Where, however, the provisions of an insurance policy are "reasonably susceptible to more than one interpretation," the ambiguity in the policy language is construed against the insurer and liberally in favor of the insured. Sharonville at ¶ 6 ; King v. Nationwide Ins. Co. , 35 Ohio St.3d 208, 519 N.E.2d 1380 (1988), syllabus; but see *1050 Oriani v. Reach Out Disposal, L.L.C. , 8th Dist. Cuyahoga No. 103128, 2016-Ohio-7392, 2016 WL 6139150, ¶ 14 ("[W]here the plaintiff is not a party to the insurance contract, the plaintiff is not in a position to urge that the contract be strictly construed against the other party. * * * Where a court decides whether a claimant is insured under a policy, ambiguities are construed in favor of the policyholder, not the claimant."), citing Westfield Ins. , 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, at ¶ 14, 35. " '[A]n exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded.' " (Emphasis omitted.) World Harvest Church v. Grange Mut. Cas. Co. , 148 Ohio St.3d 11, 2016-Ohio-2913, 68 N.E.3d 738, ¶ 30, quoting Hybud Equip. Corp. at 665, 597 N.E.2d 1096.
{¶ 27} Applying these principles, we turn to the policy language at issue in this case.
Liability Coverage under the Westfield Policy Issued to Recreation and Risk Management
{¶ 28} The Westfield policy provides in relevant part:
BUSINESSOWNERS COVERAGE FORM
* * *
SECTION II - LIABILITY
A. Coverages
1. Business Liability
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. * * * b. This insurance applies:
(1) To "bodily injury" and "property damage" only if:
(a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory".
(b) The "bodily injury" or "property damage" occurs during the policy period; and
(c) Prior to the policy period, no insured listed under Paragraph C.1. Who is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. * * *
{¶ 29} A non-owned auto liability endorsement "modifies [the] insurance" provided under section II.A.1. of the BOC form, in relevant part, as follows:
HIRED AUTO AND NON-OWNED AUTO LIABILITY
This endorsement modifies insurance provided under the following:
BUSINESSOWNERS COVERAGE FORM
* * *
A. Insurance is provided only for those coverages for which a specific premium charge is shown in the Declarations or in the Schedule.
* * *
2. Non-Owned Auto Liability
The Insurance provided under Paragraph A.1. Business Liability in Section II - Liability , applies to "bodily injury" or "property damage" arising out of the use of any "non-owned auto" in your business by any person."
{¶ 30} "Non-owned auto" is defined as "any 'auto' you do not own, lease, hire, rent or borrow which is used in connection with your business. This includes 'autos' owned by your 'employees', your partners or your 'executive officers', or members of their households, but only while used in your business or your personal affairs." (Westfield Policy, Non-Owned Auto Liability *1051 Endorsement, Section C.3.) "You" and "your" "refer to the Named Insured shown in the Declarations," i.e., Recreation and Risk. (Westfield Policy, BOC Form, at 1.)
{¶ 31} Focusing on section A.2. of the endorsement - "[t]he insurance provided * * * applies to 'bodily injury' * * * arising out of the use of any 'non-owned auto' in your business by any person" - appellants argue that because there is no dispute that: (1) the accident vehicle was owned by Hobbs (and not Recreation or Risk) and (2) Raudins' injuries occurred while Hobbs was using the vehicle in connection with the business of Recreation and Risk, the trial court erred in concluding that the Westfield policy did not cover Hobbs' liability for Raudins' injuries.
{¶ 32} The trial court acknowledged that, based on the plain language of section A.2. and the undisputed facts, Raudins' injuries could potentially fall within the scope of the endorsement's liability coverage for " 'bodily injury' * * * arising out of the use of any 'non-owned auto' in your business by any person." However, as the trial court indicated, this was just the first step in determining whether coverage existed under the endorsement. For liability coverage to exist, Hobbs had to also be an "insured" for purposes of the endorsement. Following a thorough analysis of the relevant policy language, the trial court concluded that Hobbs was not an insured under the endorsement and that, therefore, there was no coverage for the accident under the Westfield policy.
{¶ 33} In this appeal, all of the appellants challenge the trial court's finding that there was no coverage under the Westfield policy because Hobbs was not an insured for purposes of the endorsement - albeit for different reasons. We address each of appellants' arguments in turn.
{¶ 34} In their first assignment of error, Erie, Risk and Recreation argue that whether Hobbs was an insured under the endorsement is irrelevant because the endorsement "specifically insured the accident vehicle," regardless of whether Hobbs was an insured. Citing the "rule of thumb" that "insurance on the car is primary" and that "insurance follows the car," they contend that the Westfield policy provided primary coverage for Raudins' injuries because it insured the accident vehicle and that the trial court "incorrectly held that both the accident vehicle and Hobbs must have coverage in order for the Westfield Policy to be applicable." We disagree.
Coverage for the Accident Vehicle under the Endorsement
{¶ 35} Section II.A.1.a. of the BOC form identifies the business liability coverage provided under the Westfield policy. Westfield agrees to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' * * * to which this insurance applies." (Westfield Policy, BOC Form, Section II.A.1.a.) Section A.2. of the endorsement specifies a set of circumstances giving rise to "bodily injury" "to which this insurance applies": "The Insurance provided under Paragraph A.1. Business Liability in Section II - Liability, applies to 'bodily injury' * * * arising out of the use of any 'non-owned auto' in your business by any person." (Emphasis added.) (Westfield Policy, Non-Owned Auto Liability Endorsement, Section A.2.) Reading these provisions in tandem, it is clear that coverage under the endorsement applies to "sums that the insured becomes legally obligated to pay as damages," (Westfield Policy, BOC form, Section II.A.1.a.), for "bodily injury * * * arising out of the use of any 'non-owned auto' in your business by any person," (Westfield Policy, Non-Owned Auto Liability Endorsement, Section A.2.)
*1052 Thus, for there to be non-owned auto liability coverage under the endorsement, an "insured" must be legally obligated to pay damages because of "bodily injury" arising out of the use of any "non-owned auto" in Recreation's or Risk's business by any person.
{¶ 36} At issue in this case is Hobbs' liability for Raudins' injuries. Accordingly, the trial court properly determined that, under the plain language of the policy, for Hobbs' liability for Raudins' injuries to be covered under the endorsement, Hobbs needed to be an "insured" for purposes of the endorsement; it was not enough that Raudins' injuries arose out of Hobbs' use of a "non-owned auto" while conducting business on behalf of Recreation and Risk. Where there is no "insured" legally obligated to pay damages, Westfield has no obligation to pay under the policy.
{¶ 37} Ohio Farmers Ins. Co. v. Ohio Cas. Ins. Co. , 28 Ohio App.2d 170, 170-171, 275 N.E.2d 877 (12th Dist. 1971), and Carolina Cas. Ins. Co. v. Canal Ins. Co. , 555 Fed.Appx. 474 (6th Cir. 2014), upon which Erie, Recreation and Risk rely in support of their argument, are inapposite. In Ohio Farmers Ins. , Hewitt Mulford borrowed a station wagon from Bertsche Chevrolet, Inc. ("Bertsche"), the owner of the vehicle, to transport wedding guests. Mulford hired Orion Jones to drive the station wagon. Ohio Farmers Ins. at 170-171, 275 N.E.2d 877. While Jones was transporting wedding guests, the vehicle was involved in an accident with another vehicle, resulting in damage to several parked cars. Id. at 171, 275 N.E.2d 877.
{¶ 38} Ohio Farmers Insurance Co. ("Ohio Farmers") insured Jones and Bertsche. The Ohio Farmers insurance policy indemnified Orion Jones while he was driving a "non-owned" vehicle. As it related to the station wagon owned by Bertsche, the Ohio Farmers policy afforded coverage to any other person using that vehicle "only if no other valid and collectible automobile liability insurance either primary or excess, * * * is available to such person." Id. Zurich-American Insurance Co. ("Zurich American") issued an insurance policy to Mulford. Id. The definition of "insured" under the Zurich-American policy included "any person while using * * * a hired auto" with the permission of the named insured. Id.
{¶ 39} The issue in Ohio Farmers Ins. was whether the Zurich-American policy could "be made to walk as primary insurance" in light of the "other insurance" provision in the Ohio Farmers policy. Id. at 172-174, 275 N.E.2d 877. The trial court found in favor of Ohio Farmers and ordered Zurich-American to defend Jones and to pay any judgment entered against him arising out of the accident. Id. at 172, 275 N.E.2d 877. The Twelfth District reversed. The court concluded that the station wagon was not "hired" within the meaning of the Zurich-American policy because the bailment was gratuitous and noting that "insurance follows the car" and the "owner's policy being 'innately obligatory,' " held that the Ohio Farmers policy provided primary coverage for Jones. Id. at 174, 275 N.E.2d 877.
{¶ 40} In Carolina Cas. Ins. , the Sixth Circuit held that the insurance policy under which the vehicle at issue was specifically listed as a "covered auto" provided primary coverage for the accident rather than the insurance policy insuring the company for which the vehicle's driver was working under contract at the time of the accident. Id. at 475, 479. The court concluded that although the named insured did not, in fact, legally own the vehicle, because the policy specifically listed the vehicle as a "covered 'auto' you own," the named insured "owned" the vehicle for purposes of the policy, and the driver was *1053 an "insured" under the policy because he was using a "covered 'auto' " owned by the named insured with permission at the time of the accident. Id. at 477-479. In this case, it is the Erie policy - not the Westfield policy - that specifically listed the Toyota Tundra as a "covered auto."
Ambiguity in Definition of "Insured" under the Endorsement
{¶ 41} As to who is an "insured" under the endorsement, the endorsement states:
HIRED AUTO AND NON-OWNED AUTO LIABILITY
This endorsement modifies insurance provided under the following:
BUSINESSOWNERS COVERAGE FORM
* * *
2. Paragraph C. Who is An Insured in Section II - Liability is replaced by the following:
1. Each of the following is an insured under this endorsement to the extent set forth below:
a. You;
b. Any other person using a "hired auto" with your permission;
c. For a "non-owned auto":
(1) any partner or "executive officer" of yours; or
(2) Any "employee" of yours but only while such "non-owned auto" is being used in your business; and
d. Any other person or organization, but only for their liability because of the acts or omissions of an insured under a., b, or c. above.
2. None of the following is an insured:
a. Any person engaged in the business of his or her employer for "bodily injury" to any co-"employee" of such person injured in the course of employment, or to the spouse, child, parent, brother or sister of that co-"employee" as a consequence of such "bodily injury"; or for any obligation to share damages or repay someone else who must pay damages because of the injury;
b. Any partner or "executive officer" for any "auto" owned by such partner or officer or a member of his or her household;
* * *
d. The owner or lessee (of whom you are a sublessee) or a "hired auto" or the owner of a "non-owned auto" or any agent or "employee" or any such owner or lessee; * * *
(Westfield Policy, Non-Owned Auto Liability Endorsement, Section B.2.) "Executive officer" is defined as "a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document." (Westfield Policy, BOC Form, Section II.F.6.)
{¶ 42} Amica and Hobbs assert that this provision is complicated and confusing and, therefore, ambiguous. They contend that because "there is at least one interpretation of [the endorsement] which could justifiably provide insurance coverage for Hobbs' operation of his motor vehicle," the trial court was required to construe the ambiguity in the policy language against Westfield and find that liability coverage existed for Hobbs under the endorsement. Once again, we disagree.
{¶ 43} Simply because, as Amica contends - and the trial court found - determining the scope of coverage under the endorsement may be a "dizzying ordeal," does not mean that the policy language is ambiguous. "A contract is not ambiguous merely because it is complex or difficult to read as a whole."
*1054 Value City, Inc. v. Integrity Ins. Co., 30 Ohio App.3d 274, 279, 508 N.E.2d 184 (10th Dist. 1986). Although ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured, "a court cannot create ambiguity in a contract where there is none." Lager v. Miller-Gonzalez , 120 Ohio St.3d 47, 2008-Ohio-4838, 896 N.E.2d 666, ¶ 16, citing Hacker v. Dickman , 75 Ohio St.3d 118, 119, 661 N.E.2d 1005 (1996). Ambiguity exists only when a provision is susceptible of more than one reasonable interpretation. Lager at ¶ 16.
{¶ 44} Although the provisions of the endorsement are arguably "complicated and involved," they are not, "when analyzed" as a whole, "ambiguous." See, e.g., Moyer v. Aron , 175 Ohio St. 490, 493-494, 196 N.E.2d 454 (1964) (insurance policy issued to auto dealer that covered the 1958 Mercury driver was test driving with permission of the dealer when he collided with a bicycle killing the plaintiff's son did not provide insurance coverage for the accident where driver was not an "insured" under the terms of the policy; "[a] person is not an insured under an automobile insurance policy unless such person is defined as an insured by the terms of the policy").
{¶ 45} Section B.2. of the endorsement, "Who Is An Insured," is comprised of two subsections (1) subsection B.2.1., which identifies who is an insured under the endorsement (i.e., "[e]ach of the following is an insured under this endorsement to the extent set forth below"), and subsection B.2.2., which identifies who is not an insured under the endorsement (i.e., "[n]one of the following is an insured"). Amica and Hobbs argue that section B.2. is ambiguous because after a "straight-forward grant of coverage" in subsection B.2.1., it then "confusingly appear[s] * * * to remove," in subsection B.2.2., "the exact coverage Westfield just granted" in the "immediately preceding" section. In other words, Amica and Hobbs argue that because Hobbs would qualify as an insured under subsection B.2.1.c. of the endorsement, under which an "executive officer" of Recreation or Risk is an insured for a "non-owned auto," we should ignore the remainder of section B.2. (in particular, subsections B.2.2.b. and d.), which qualifies subsection B.2.1. and states unequivocally that "[a]ny * * * 'executive officer' " is not an insured "for any 'auto' owned by such * * * officer" and that "[t]he owner * * * of a 'non-owned auto' " is not an insured.
{¶ 46} That we cannot do. As the Ohio Supreme Court has stated:
Insurance policies cannot be read in an overly circumscribed fashion. Gomolka , 70 Ohio St.2d at 172, 436 N.E.2d 1347. "One may not regard only the right hand which giveth, if the left hand also taketh away. The intention of the parties must be derived instead from the instrument as a whole, and not from detached or isolated parts thereof." Id. , citing Stickel v. Excess Ins. Co. of Am. , 136 Ohio St. 49, 53, 23 N.E.2d 839 (1939), and Germania Fire Ins. Co. v. Schild , 69 Ohio St. 136, 68 N.E. 706 (1903).
Sauer v. Crews , 140 Ohio St.3d 314, 2014-Ohio-3655, 18 N.E.3d 410, ¶ 13. If we were to accept Amica and Hobbs' interpretation of section B.2., we could not give meaning to every provision of the endorsement; subsection B.2.2.b. would become meaningless.[8]
*1055 {¶ 47} Reading the relevant provisions of the Westfield policy in their entirety - including both subsection B.2.1. and subsection B.2.2. of the endorsement - and giving effect to every word used therein, as we are required to do, we find no ambiguity with respect to whether Hobbs' liability for Raudins' injuries is covered under the Westfield policy and no error by the trial court in determining that Hobbs was not an insured entitled to liability coverage under the endorsement. Because Hobbs was an executive officer driving his own vehicle at the time of the accident, he was not an insured and there was no coverage for Raudins' damages under the endorsement. As the trial court explained, this result is not only clear from a plain reading of the policy language, it makes sense:
The net effect of the non-owned auto endorsement is unambiguous: a corporate officer is not covered for the use of his own car on company business but is covered for the use of somebody else's car (except one owned by the company). At the same time, another company employee is covered while using the officer's car on company business. This result makes perfect sense when the non-owned auto endorsement to the business policy is understood to ensure coverage for the occasional use of a car that should otherwise be covered by a separate personal or business policy.
{¶ 48} Because the risk insured under the endorsement did not extend to Hobbs when he was driving his own vehicle, the trial court properly determined that Westfield did not have a duty to defend or indemnify Hobbs with respect to Raudins' claim for damages resulting from the accident.
{¶ 49} The Ninth District reached a similar conclusion in Hicks v. Moore Mem. United Methodist Church , 9th Dist. Summit Nos. 11382 and 11383, 1984 WL 6175 (May 23, 1984). In that case, a passenger was injured when a driver, who was using his vehicle to provide transportation in connection with a church-sponsored hayride, caused an accident. Id. at *1. The passenger and her father sued the driver, and the driver was found liable for the injuries sustained in the accident. Id. at *1.
{¶ 50} The plaintiffs filed a supplemental petition, seeking a declaration that the driver was covered under the church's insurance policy and to have the church's insurance applied to the judgments the plaintiffs had obtained against the driver. Id. Similar to the policy at issue in this case, the church's policy had a provision that identified "[p]ersons [i]nsured * * * to the extent set forth below"- which included any person using a hired vehicle with permission of the church - that was then followed by a provision that stated that "[n]one of the following is an insured" - which included the owner of a hired vehicle. Id. at *2. Interpreting these provisions, the trial court concluded that the driver was not an insured under the church's insurance policy because he was driving his own vehicle at the time of the accident. Id. at *1. The plaintiffs appealed. The plaintiffs argued that the policy was ambiguous and must be construed in favor of the insured because "section (c) [which identified the "[p]ersons [i]nsured"] gives [the driver] coverage while section (ii) [which stated that "[n]one of the following is an insured"] excludes him as an insured." Id. at *2. The appellate court rejected the plaintiffs' argument and affirmed the trial court's decision, reasoning as follows:
*1056 It is true that an insurance policy subject to different interpretations will be given that interpretation most favorable to the insured, especially in the case of exclusions and exceptions. * * * However, we find no ambiguity and no conflicting interpretations in the instant case. Assuming [the driver] is insured as either a volunteer or as a person using a hired automobile, he is only insured "to the extent set forth below," which is to the extent he is not the owner of the vehicle. The purpose of the exclusion seems obvious. The owner of the automobile should carry his own insurance to protect himself and not shift his personal risk to the church.
Id. at *2 ; see also Aetna Cas. & Sur. Co. v. Kassab , Mich. Ct. App. Nos. 194208 and 194210, 1997 WL 33344233, *2 (Aug. 19, 1997) (interpreting similar policy language and concluding that policy was unambiguous - even if it was "inartfully worded or clumsily arranged' " - and that executive officer who was driving a vehicle he owned was not an "insured" under non-owned auto liability endorsement), quoting Bianchi v. Auto. Club of Michigan , 437 Mich. 65, 70, 467 N.W.2d 17 (1991) ; Cincinnati Ins. Co. v. Continental Cas. Co. , 1st Dist. Hamilton Nos. C-940884 and C-940890, 1995 WL 714262, *2 (Dec. 6, 1995) (policy was unambiguous in excluding employee of owner of hired truck from coverage).
{¶ 51} Appellants argue that if the language of section B.2. of the endorsement is not ambiguous, then it provides "illusory coverage" because "the same endorsement affording coverage to Hobbs also precludes coverage for Hobbs" and, therefore, it should not have been applied to bar liability coverage for Hobbs.
{¶ 52} An insurance provision is illusory "when it appears to grant a benefit to the insured, although in reality it does not." Beaverdam Contr. v. Erie Ins. Co. , 3d Dist. Allen No. 1-08-17, 2008-Ohio-4953, 2008 WL 4378153, ¶ 49. If a provision in an insurance policy renders the contract illusory, the provision is unenforceable. Will Repair, Inc. v. Grange Ins. Co. , 2014-Ohio-2775, 15 N.E.3d 386, ¶ 25 (8th Dist.). Where, however, there is some benefit to an insured through an insurance policy, it is not illusory. Collins v. Auto-Owners Ins. Co. , 2017-Ohio-880, 80 N.E.3d 542, ¶ 28 (12th Dist.). "Courts are not inclined to give insurance provisions meanings that would render them illusory." Will Repair at ¶ 25, quoting Beaverdam at ¶ 49 ; see also Liqui*Lawn Corp. v. Andersons , 8th Dist. Cuyahoga No. 50240, 1986 WL 4394, *3 (Apr. 10, 1986) ("[C]ourts disfavor contract interpretations which render contracts illusory or unenforceable.").
{¶ 53} In this case, the endorsement would have covered, as an insured, injuries to a third-party caused by an executive officer operating a vehicle in the course of Recreation or Risk's business that was not owned by Recreation, Risk, the executive officer or a family member, e.g., if the officer was driving a vehicle in the course of company business that was owned by another officer or employee. The endorsement provides "a form of gap coverage" that assumes that executive officers driving their own vehicles will have their own personal auto liability insurance. See, e.g., Cardservice Internatl. v. Peerless Inc. , N.J. Super. No. A-5633-04T1, 2006 WL 2818775, *3 (Oct. 4, 2006), citing Succession of Fannaly v. Lafayette Ins. Co. , 805 So.2d 1134, 1139-1140 (La. 2002) (explaining that "the apparent purpose of [an] exception [providing that the owner of a non-owned auto is not an insured] is to provide the named insured protection for liability arising out of the use of non-owned autos, but to preclude coverage for the owner who should have purchased liability coverage for his own automobile").
*1057 Accordingly, it cannot be said that the provision was illusory.
Applicability of the "Insured Contracts" Exception
{¶ 54} Erie, Risk and Recreation also argue that the trial court erred in "fail[ing] to address the 'insured contract' language" in the Westfield policy. They contend that the trial court should have found that the operating agreements for Recreation and Risk[9] were "insured contracts" under section B.1. of the endorsement, "thereby triggering an exception to the '[n]one of the following is an insured' exclusion."[10]
{¶ 55} Section B.1. of the endorsement, which modifies and supplements the exclusions under the BOC form, provides in relevant part:
HIRED AUTO AND NON-OWNED AUTO LIABILITY
This endorsement modifies insurance provided under the following:
BUSINESSOWNERS COVERAGE FORM
* * *
B. For insurance provided by this endorsement only:
1. The exclusions, under the Paragraph B.1. Applicable To Business Liability Coverage , in Section II - Liability , other than Exclusions a., b., d., f. and i., and the Nuclear Energy Liability Exclusion, are deleted and replaced by the following:
1. "Bodily injury" to" [sic]:
(1) An "employee" of the insured arising out of and in the course of:
(a) Employment by the insured; or
(b) Performing duties related to the conduct of the insured's business; or
(2) The spouse, child, parent, brother or sister of the "employee" as a consequence of Paragraph (1) above.
This exclusion applies:
(a) Whether the insured may be liable as an employer or in any other capacity; and
(b) To any obligation to share damages or repay someone else who must pay damages because of injury.
This exclusion does not apply to:
(l) Liability assumed by the insured under an "insured contract" * * *.
(Westfield Policy, Non-Owned Auto Liability Endorsement, Section B.1.)
{¶ 56} "Insured contract" is defined to include "[t]hat part of any other contract *1058 or agreement pertaining to your business * * * under which you assume the tort liability of another party to pay for the 'bodily injury' * * * to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement." (Westfield Policy, BOC Form, Section II.F.9.f.) The definition of "[e]mployee" states: " 'Employee' includes a leased worker. 'Employee' does not include a 'temporary worker.' " (Westfield Policy, BOC Form, Section II.F.5.)
{¶ 57} The "insured contract" exception has nothing to do with whether Hobbs in an insured under the endorsement. It is an exception to an exclusion of coverage under section B.1.1. of the endorsement (the "employee injury exclusion"). It applies to restore coverage if the employee injury exclusion is triggered. It is not an exception to "who is an insured" or "[n]one of the following is an insured" under Section B.2. of the endorsement. The trial court never needed to reach the issue of whether the operating agreements constituted "insured contracts" under the insured contract exception to the employee injury exclusion because it properly determined that Hobbs was not an insured for purposes of the policy's non-owned auto liability coverage under the endorsement.
{¶ 58} Amica and Hobbs' assignment of error and Erie, Recreation and Risk's first assignment of error are overruled.
Coverage under the Erie Policy
{¶ 59} In their second assignment of error, Erie, Recreation and Risk argue that the trial court erred when it failed to find that an exclusion applied to eliminate coverage for the accident under the Erie policy. Under the Erie policy, auto liability coverage extends to "anyone we protect," which is defined as follows:
"Anyone we protect " means:
1. "you " or any "relative " using an "auto we insure ;"
2. any person using, or any person or organization legally responsible for the use of, an "owned auto we insure ." This use must be with "your " permission unless the use is by a "relative ;" and
3. any person or organization legally responsible for the use, by "you " or a "relative ," of any "nonowned auto ." This protection applies only if the person or organization does not own or hire the vehicle being used.
(Erie Policy, Liability Protection, at 4.)
{¶ 60} "You" is Hobbs, the named insured, and "auto we insure" and "owned auto we insure" include the Toyota Tundra as an " 'auto ' * * * described on the 'Declarations ' for the coverages 'you ' have purchased." (Erie Policy, General Policy Definitions, at 3-4.)
{¶ 61} The policy further provides, in relevant part:
Bodily Injury Liability Coverage
* * *
If these coverages are indicated on the "Declarations ," "we " will pay all sums that "anyone we protect " legally must pay as damages caused by an accident covered by this policy. The accident must arise out of the ownership, maintenance, use, loading or unloading of an "auto we insure ."
Damages must involve:
1. bodily injury, meaning physical harm, sickness, disease, or resultant death to a person * * *
(Erie Policy, Liability Protection, at 4.)
{¶ 62} The Erie policy, however, excludes from coverage "bodily injury to employees of 'anyone we protect' occurring in the course of employment" ("Exclusion 7"):
*1059 EXCLUSIONS - What We Do Not Cover
"We " do not cover:
* * *
7. bodily injuries to employees of "anyone we protect " occurring in the course of employment. "We " will provide coverage for such an injury to a domestic employee not covered and not required to be covered by a workers compensation law.
(Erie Policy, Exclusions What We Do Not Cover, at 7.)
{¶ 63} Assuming that Hobbs "legally must pay [Raudins'] damages" resulting from the accident, Erie, Recreation and Risk contend that the trial court should have found that Raudins' injuries occurred in the course of his employment with Hobbs, Recreation and/or Risk and were, therefore, excluded from coverage under Exclusion 7.
{¶ 64} Policy exclusions must be clear and unambiguous to be enforceable. Neal-Pettit v. Lahman , 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 19. An insurer who claims that a policy exclusion removes insurance coverage must show that the exclusion specifically applies. Id. Erie has not met its burden in this case.
{¶ 65} Based on the plain language of the policy, the exclusion eliminates coverage for injuries that occur to an insured's employees, i.e., employees of "anyone we protect," during the course of their employment-injuries for which an employee would generally be compensated through the workers' compensation system. Erie, Recreation and Risk assert that Hobbs, Recreation and Risk all "fall into the Erie policy's 'anyone we protect' language" to which Exclusion 7 applies. They contend that because Raudins was an employee of Hobbs, Recreation and Risk at the time of the accident and was injured in the course of this employment, Exclusion 7 eliminated coverage for Raudins under Erie's policy "from all three insureds-Hobbs, Risk, and Recreation."
{¶ 66} "Employee" is not defined in the policy. Black's Law Dictionary defines "employee" as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary 639 (10th Ed. 2014). Webster's Third International Dictionary defines "employee" as "one employed by another [usually] in a position below the executive level and [usually] for wages"; "any worker who is under wages or salary to an employer and who is not excluded by agreement from consideration as such a worker." Webster's Third International Dictionary 743 (1993).
{¶ 67} The only evidence the parties presented regarding Raudins' "employment" was the testimony of Raudins and Hobbs, the operating agreements of Recreation, Risk and RIS Holdings and documents relating to Raudins' workers' compensation claim. This evidence established that, at the time of the accident, Raudins was a member of RIS Holdings, vice-president and chief operating officer of RIS Holdings, vice-president and chief operating officer of Recreation and a director of Recreation and Risk. The evidence further showed that Raudins was compensated for his services through guaranteed payments from Recreation reported on a K-1 form issued by RIS Holdings, not salary or wages reported on a W-2 form, and that Raudins filed a workers' compensation claim that was denied on the ground that he was not an employee of any of the companies and did not otherwise have workers' compensation coverage.
*1060 {¶ 68} Even assuming that (1) Raudins qualified as an "employee" of Recreation or Risk, (2) Recreation and/or Risk qualified as "anyone we protect," i.e., that Recreation and Risk were "legally responsible for the use of, an 'owned auto we insure' " and (3) Raudins' injuries occurred during the course of his employment with Recreation and Risk - so as to take away any coverage Recreation and Risk otherwise may have had under the Erie policy - there would still be the issue of coverage for Hobbs. Although Exclusion 7 takes away coverage for an insured when one of its employees is injured during the course of employment, it would not be reasonable to read the language of the exclusion as taking away coverage for all insureds when the employee of one insured is injured during the course of employment. Even if Erie had established that Raudins was an employee of Risk or Recreation (or presented sufficient evidence to create a genuine issue of material fact regarding the issue), there is nothing in the record to suggest that Raudins was an employee of Hobbs.
{¶ 69} Erie, Recreation and Risk acknowledge that Hobbs was not a "direct employer" of Raudins; nevertheless, they contend that, due to Hobbs' position as an officer for Risk and Recreation and status as a member of RIS Holdings, the trial court should have found that Raudins "was acting as Hobbs' employee" and was, therefore, his "de facto employer." They cite no authority to support their "de facto employer" argument and have no evidence to support their claim that Raudins was otherwise an employee of Hobbs at the time of the accident. As such, Erie has failed to show that the exclusion applied to take away liability coverage for Hobbs. The trial court properly determined that the Erie policy provided liability coverage for Hobbs' negligence in the accident. Erie, Recreation and Risk's second assignment of error is overruled.
Pro Rata Apportionment of Liability Between Policies
{¶ 70} In their third assignment of error, Erie, Recreation and Risk contend that the trial court erred because it failed to find a pro-rata apportionment of liability between Erie and Westfield based on an "other insurance" clause in the Erie policy. Because we have found no error by the trial court in concluding that there was no coverage under the Westfield policy for the injuries Raudins sustained in the accident, Erie, Recreation and Risk's third assignment of error is moot.
{¶ 71} Judgment affirmed.
PATRICIA ANN BLACKMON, J., and FRANK D. CELEBREZZE, JR., J., CONCUR

In Appeal No. 106232, Amica and Hobbs appeal from the trial court's order in Case No. CV-12-789591 granting Westfield's motion for summary judgment on Hobbs' third-party complaint. In Appeal No. 106233, Amica and Hobbs appeal from the trial court's order in Case No. CV-14-819984 granting Westfield's motion for summary judgment on the complaint filed by Raudins and his wife, Dee Raudins (the "Raudinses"). In Appeal No. 106236, Erie, Recreation and Risk appeal from the trial court's order in Case No. CV-12-789591 denying Erie's motion for summary judgment and granting Westfield's motion for summary judgment on Hobbs' third-party complaint. In Appeal No. 106238, Erie, Recreation and Risk appeal from the trial court's order in Case No. CV-14-819984 granting Westfield's motion for summary judgment on the Raudinses' complaint. In September 2017, this court, sua sponte, consolidated Appeal Nos. 106232 and 106233 and Appeal Nos. 106236 and 106238 for briefing, hearing and disposition. On May 10, 2018, this court, sua sponte, consolidated all four appeals for disposition.

Raudins filed workers compensation claims identifying Recreation, Risk and RIS Holding as his employers. With respect to Recreation, Raudins' workers' compensation claim was denied on the ground that he "was not an employee of the named [e]mployer," but "was an owner of the business who had not obtained [workers' compensation] coverage for himself." With respect to Risk, his claim was denied on the ground that "[t]he claimant is noted as being a partner in the company and did not elect coverage, therefore it is deemed that there is no coverage for this claim." With respect to RIS Holdings, the claim was denied on the ground that "the BWC review as performed, * * * establishes there was no coverage of the claimant on the day of the incident." Hobbs testified that Recreation and Risk complied with requirements for obtaining workers' compensation coverage for their employees but that the payroll reported to the Ohio Bureau of Workers' Compensation for purpose of calculating their workers' compensation premiums did not include the guaranteed payments received by Hobbs and Raudins. He testified that no workers' compensation coverage was obtained for RIS Holdings because it had no employees.

In addition to the businessowners policy, Westfield also issued an umbrella policy to Recreation and Risk. In its summary judgment motion, discussed infra , Westfield argued that there was no coverage for the accident under either its businessowners policy or its umbrella policy. The trial court did not consider the issue of whether coverage existed under the umbrella policy, concluding that "any consideration of the umbrella policy is superfluous because there is no affirmative claim in any pleading in either case for a declaration of the rights and obligations of the parties under the umbrella policy." None of the parties has challenged the trial court's decision regarding that issue. Accordingly, we do not address coverage under Westfield's umbrella policy in this consolidated appeal.

Erie filed its answer as "Erie Insurance Exchange incorrectly designated as Erie Insurance Company." However, the notices of appeal in this case were filed in the name of "Erie Insurance Company." To the extent that there is a difference between these entities, which is not clear from the record, we refer to both entities collectively herein as "Erie."

Westfield moved for summary judgment on the issue of coverage both under its principal policy, the "businessowners coverage form" ("BOC"), and the "non-owned auto liability" endorsement to the BOC form. Only coverage under the endorsement is at issue in this consolidated appeal.

In support of their motions, the parties introduced copies of the insurance policies at issue, select discovery responses, excerpts from the depositions of Hobbs and Raudins, copies of the operating agreements of Recreation, Risk and RIS Holdings and copies of documents relating to the denial of Raudins' workers' compensation claims.

The trial court also rejected the Raudinses' argument that liability coverage existed under the Westfield policy even if Hobbs was not covered under the endorsement because the "vicarious liability [of Recreation and RIS] for Hobbs's negligence" was covered on the ground that "neither lawsuit includes a claim for such coverage." The trial court indicated that "[t]he third-party complaint by Hobbs against Westfield in 789591 alleges only that 'Westfield must defend and indemnify' him" and that "[t]he complaint by Raudins in 819984 seeks only UM/UIM coverage under a policy that provides no such coverage."

Amica and Hobbs also assert in their reply brief that there is "a conflict or ambiguity" between "Who Is An Insured" under section B.2. and the definition of "non-owned auto" in section C.3., which they contend provides "additional coverage" to Hobbs as an insured that "might not have otherwise been provided." Following a thorough review of the policy language, we find no conflict or ambiguity between these provisions.

The operating agreements for Recreation and Risk contain identical indemnification provisions, which provide as follows:
The Company shall indemnify the Member, the Board, any officers, and agents for all costs, losses, liabilities, and damages paid or accrued by the Member (either as Member or as agent), any officers, or agents in connection with the business of the Company, to the fullest extent provided or allowed by the State of Ohio and the Act. In addition, the Company may advance costs of defense of any proceeding to the Members, the Board, any officers, or agent.

In their reply brief, appellants also argue for the first time that coverage existed under the Westfield policy based on the "insured contracts" exception to the "contractual liability" exclusion under section B.1.b. of the BOC form. Appellants did not raise this argument below or in their principal brief on appeal. Accordingly, we do not consider it. See, e.g., Bank of N.Y. Mellon Trust Co., N.A. v. Unger , 8th Dist. Cuyahoga No. 101598, 2015-Ohio-769, 2015 WL 930179, ¶ 7, fn. 1 (appellate courts "cannot accept arguments raised for the first time in the reply brief on appeal"), citing Kleinfeld v. Huntington Natl. Bank , 8th Dist. Cuyahoga No. 90916, 2008-Ohio-6486, 2008 WL 5182703, ¶ 37 (appellant "cannot raise for the first time on appeal arguments she failed to raise in the trial court below").